[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum Dated June 26, 1997
The issue in this post judgment matter is to what extent the defendant husband is obligated to pay the cost of postsecondary school education when the separation agreement, incorporated by reference in the decree, stated "The Husband and Wife shall pay, to the extent they are each financially able".
FACTS
The plaintiff, ex-wife, and the defendant, ex-husband, were married on September 20, 1970. The three children, issue of the marriage, are: Crista G. Hearon; born March 10, 1974, Carel A. Hearon, born September 3, 1975, and Justin C. Hearon; born May 9, 1977. On September 26, 1986, the parties' marriage was dissolved. The separation agreement executed by the parties on September 26, 1986 was incorporated by reference in the decree.
The written separation agreement provided for postmajority payments for the children. "If the agreement is in writing and provides for the care, education, maintenance or support of a child beyond the age of eighteen, it may also be incorporated or otherwise made a part of any such order and shall be enforceable to the same extent as any other provision of such order or decree, not withstanding the provisions of Section 1-1d." C.G.S. § 46b-66, P.A.77-488. Pursuant to that statute the party's agreement contained the following in Paragraph 2.4: CT Page 6572
 "If any or all of the children are ready, willing and able to attend any post secondary school institution, including but not limited to, any college, university, or post-secondary school, vocational school and/or the like (all of the foregoing being referred to hereinafter as `institution'), the Husband and Wife shall pay, to the extent they are each financially able, the cost of the education for such children so long as such education is commenced within one school year from the date of graduation from secondary school, and that such education is completed within five (5) years from the date of the commencement of such education.
 The cost of education as used in this Agreement shall include the tuition, room and board, at said institution, books, necessary supplies, one round-trip airline ticket, or the equivalent, per school year, and other normal expenses and fees as charged by the applicable institution.
 The Husband and Wife's payment for said education, if applicable, may be made directly to the appropriate institution."
On June 7, 1994 the plaintiff filed a motion for contempt for the defendant's failure to pay his portion of the college expenses for two of the children in violation of Paragraph 2.4 of the separation agreement. On June 7, 1994 the plaintiff filed a motion for modification of child support although two of the children were beyond eighteen at the time of the motion.
On September 6, 1996 the plaintiff filed a further motion that the defendant be held in contempt "for his failure to make payments toward the college educational expenses of the adult children in accordance with the judgment of the court entered on September 26, 1986." On September 20, 1996 the defendant filed a motion for modification.
Crista G. Hearon, born March 10, 1974, and Carel A. Hearon, born September 3, 1975, both graduated from high school. They commenced postsecondary education at a duly licensed college within one year from the date of graduation from secondary school. Crista completed her college education within five years from the date of commencement of such education. Carel is currently completing her education and will complete her college education within five years CT Page 6573 from the date of commencement of such education.
The defendant paid $4,800 in accordance with Paragraph 2.4 at the rate of $800 per month from January 1996 through June, 1996. He also paid an additional $800 in various periodic payments. Except for these payments the defendant has not contributed any money to the college education of the two older children. The plaintiff has spent monies for the college education of the two older children, including "tuition, room and board, books, necessary supplies, round-trip airline tickets or the equivalent per school year and other normal expenses and fees as charged by the applicable institution" as set forth in Paragraph 2.4 of the September 26, 1986 decree. She seeks reimbursement of these expenses from the defendant. She also seeks a finding of contempt, an award of attorney fees, sheriff's fees and other appropriate sanctions for the defendant's contempt.
TRIAL PROCEDURES
The hearing commenced on the first two motions on June 26, 1995 before another superior court judge. The parties were represented by counsel, offered evidence and examined witnesses. Both parties were in attendance at that hearing. The hearing continued to July 17, 1995 and concluded on July 31, 1995. No decision was rendered by the trial court.
When this matter appeared before this court on the November 26, 1996 short calendar the parties requested that this court take the matter on the papers on all motions. The parties requested that this court decide the matter based upon the exhibits admitted into evidence on June 26, 1995, July 17, 1995, and July 31, 1995 as well as the transcripts of those hearings. Transcripts were obtained by the parties and submitted to the court on April 21, 1997. This court continued the matter to May 19, 1997 for the parties to review the transcripts.
This matter first appeared before this court at the short calendar on November 26, 1996. Both parties were present in open court. Both parties and their counsel on the record agreed to the procedures under C.G.S. § 51-183f and Holcombe v. Holcombe,22 Conn. App. 363, 365 (1990). The court on November 26, 1996 conducted a canvass of the parties in the presence of their attorneys in accordance with the six steps laid out in Stevens v. HartfordAccident and Indemnity Co., 29 Conn. App. 378, 386 (1992). CT Page 6574
 Upon the death, disability or resignation of a judge of the Superior Court during the pendency of a trial or hearing to the court, a successor judge should take the following steps pursuant to the authority granted by § 51-183f: (1) become familiar with the entire existing record, including, but not necessarily limited to, transcripts of all testimony and all documentary evidence previously admitted; (2) determine, on the basis of such record and any further proceedings as the court deems necessary, whether the matter may be completed without prejudice to the parties; (3) if the court finds that the matter may not be completed without prejudice to the parties it should declare a mistrial, but if the court finds that the matter may be completed without prejudice to the parties then; (4) upon request of any party, or upon the court's own request, recall any witness whose testimony is material and disputed and who is available to testify without due burden; (5) take any other steps reasonably necessary to complete the proceedings; and (6) render a decision based on the successor judge's own findings of fact and conclusions of law. Stevens v. The Hartford Accident and Indemnity Company, supra 386.
The parties, in open court, stipulated as follows:
1. The matter is submitted to the court based upon the pleadings as of November 26, 1996;
2. The transcripts of June 26, 1995, July 17, 1995 and July 31, 1995 will be considered by the court in lieu of testimony;
3. All the exhibits currently in the file are all of the exhibits submitted to the prior trial judge;
4. The court must consider those exhibits and transcripts;
5. No further exhibits, documents or witnesses will be offered by either party;
6. The court may find that the matter may be completed without prejudice to the parties. The court has the right to declare a mistrial if it later finds the matter may not be completed without prejudice to the parties;
7. No request will be made by the parties to recall any CT Page 6575 witnesses;
8. No other steps are reasonably necessary to complete the proceedings;
9. The court has the right, upon its review of the file, transcripts and exhibits, to call its own witnesses;
10. The parties waive the actual viewing by the court of the demeanor of witnesses who have testified; and
11. This trial judge will render a decision based upon its own findings of fact and conclusions of law.
DISCUSSION OF LAW
The age of majority was reduced from 21 to 18 in 1972. C.G.S.Section 1-1d. "From the above discussion of the general rules of law and the principles adopted by the state in relation to General Statutes § 1-1d, it is evident that parties to an agreement relating to support and education of children cannot impose jurisdiction on the court beyond that granted by the statutes. General Statutes § 1-1d does not authorize court-ordered support for a child once that child has reached eighteen years of age and any order beyond that time is of no force and effect as a court order." Kennedy v.Kennedy, 177 Conn. 47, 52 (1979). Public Act 77-488 now C.G.S.§ 46b-66 authorized the court to enter postmajority support orders providing the agreement is in writing and signed by both parties.
 "The jurisdiction of the Superior Court with regard to orders involving postmajority child support is limited to the power to approve and incorporate written agreements concerning such support into its orders or decrees and to enforce written agreements. General Statutes § 46b-66; Arseniadis v. Arseniadis, 2 Conn. App. 239, 244, 477 A.2d 152 (1984). The trial court does not have jurisdiction to modify written agreements involving postmajority support of children without the further written agreement of both parties. Albrecht v. Albrecht, 19 Conn. App. 146, 154, 562 A.2d 528 (1989). The question here, however, does not involve modification but involves a construction or interpretation of the original written agreement.
The power to enforce an agreement involving postmajority CT Page 6576 child support may include the power to determine the amount each party is required to contribute under the terms of the agreement, if the parties' agreement contemplates such a determination by the court. See Gallagher v. Gallagher, 11 Conn. App. 509, 528 A.2d 379
(1987). In Gallagher, we reviewed on the merits the trial court's rulings determining the amount due from the defendant pursuant to an agreement of the parties providing that the defendant would pay for the college education expenses of the parties' children `if he is financially able.' The agreement further provided that `[i]n the event any question arises as to his financial ability, the court shall determine the same." Cattaneo v. Cattaneo, 19 Conn. App. 161, 164-65 (1989).
The power to enforce an agreement involving postmajority child support may include the power to determine the amount each party is required to contribute under the terms of the agreement, if the parties' agreement contemplates such a determination by the court.Gallagher v. Gallagher, supra, 512. Cattaneo v. Cattaneo, supra
165. "If he is financially able" contemplates a determination by the court of the amount of monetary contribution due from that party." Gallagher v. Gallagher, supra 512. It has been held that the phrase "in the event any question arises as to his financial ability, the court shall determine the same," permits the court to render a decision as to whether a party is to make a contribution and if so, how much. Gallagher, supra 511.
"Although, unlike that in Gallagher, the agreement does not expressly contemplate a determination by the court of the amount of the monetary contribution due from each party, we conclude that it implicitly contemplates such a determination and thus, that the trial court had jurisdiction over the plaintiff's motion to clarify and for further order." Cattaneo v. Cattaneo, supra 165. InCattaneo the written agreement stated, "each of the parties is to contribute according to his or her respective financial ability to the cost of a four year college education for each of the minor children". There was no explicit language granting the court the power to make that determination. "The failure of the parties to agree on the amount each is to contribute to the college education costs would render the agreement without effect unless the court's power to enforce the agreement included the power to make a determination of the amount due from each party under its terms."Cattaneo v. Cattaneo, supra 165. CT Page 6577
Under some circumstances the phrase "financially able" may be an expression of intent rather than a binding obligation. Buchettov. Haggquist, 17 Conn. App. 544, 547 (1989). "In direct proportion to their adjusted gross income" was held to be a formula to be applied by the trial court in determining each party's financial contribution towards post secondary school education. Albrecht v.Albrecht, 19 Conn. App. 146, 152 (1989). Albrecht held that the parties agreed and contemplated that the court had the power to determine the amount, if any, of each party's financial contribution to posteighteen child support and college expenses based on their agreed upon formula not based on the discretion of the court. Albrecht v. Albrecht, supra 153.
Paragraph 2.4 requires both parties to pay postsecondary school expenses "to the extent that they are each financially able". The agreement is silent as to how "financially able" will be determined. Neither the separation agreement nor the decree state that the court has the authority to determine if and when a person is "financially able" and if financially able the extent of their monetary contribution. This court concludes that the separation agreement and the court order "implicitly contemplates such a determination" by the court of the amount of monetary contribution from each party. Cattaneo v. Cattaneo, supra 165.
This determination finds support in a number of superior court decisions. Fricke v. Fricke, 1993 Ct. Sup. 1519, February 10, 1993 (Moraghan, J.). (Parties' agreement contemplated court had the power to determine the amount, if any, each party should contribute to postsecondary school education). LaChappelle v. LaChappelle,
1993 CT. Sup. 572, August 5, 1993, (Karazin, J.). (Court determined that the defendant husband was not "financially able" to contribute to wife's attorney's fees under Koizim v. Koizim,181 Conn. 492, 501 (1980) standards and C.G.S. § 46b-62.)
Gumski v. Gumski, 1992 Ct. Sup. 9036, September 28, 1992, (Karazin, J.). (The court held the defendant husband in contempt for failure to pay college expenses when the court decree required "equal payments to extent financially able". This language gave the court the authority to determine whether or not a person was obligated to make the payments and, if so, the extent to they were obligated as well the authority to find the person in contempt when they failed to follow the court order.)
Hirtle v. Hirtle, 217 Conn. 394 (1991) held that courts lack subject matter jurisdiction to modify postmajority child support CT Page 6578 absent a written modification agreement. A written agreement is a jurisdiction prerequisite to valid modification of an order for postmajority support. Albrecht v. Albrecht, supra 151; Mitchell v.Mitchell, 24 Conn. App. 343, 345 (1991); Cattaneo v. Cattaneo,supra 164; C.G.S. § 46b-66.
This court concludes that the two motions for contempt do not seek a postmajority modification of a court order but instead involve the construction and interpretation of the original written September 26, 1986 agreement and resulting court order. Cattaneov. Cattaneo, supra 164.
This court concludes that the plaintiff's Motion for Modification dated June 7, 1994, to the extent that it seeks a modification of the child support for Justin C. Hearon, born May 9, 1977, is properly before the court. On June 7, 1994 the two older children, Crista G. Hearon, then 20, and Carel A. Hearon, then 18, were beyond the jurisdiction of the superior court. The Motion for Modification did not merely seek a construction or interpretation of the original written September 26, 1986 agreement but sought actual modification. Since there was no written agreement to modify, this court does not have subject matter jurisdiction to order a postmajority modification. Cattaneo v. Cattaneo, supra
164; Albrecht v. Albrecht, supra 154; Hirtle v. Hirtle, supra 400.
EVIDENCE
The court finds that the matter may go to a decision without prejudice to the parties, no other steps are reasonably necessary to complete the proceedings and no other witnesses need be called.
After reviewing the exhibits and transcripts the court finds the following facts. At the time of the September 26, 1986 decree the plaintiff earned from her employment $80,000 per year. She had cash assets of less than $5,000. She owned two automobiles worth $20,000. She was the joint owner with the defendant of the family residence at 5 Goodhill Road, Weston, Connecticut. Her affidavit stated that the house had a fair market value of $380,000 less two mortgages, for a net equity of $269,000.
The defendant was employed as a salesman in the telecommunications industry, his lifelong career. His financial affidavit indicates that he earned $58,000 a year working in New York City. His financial affidavit showed cash in a $6000 IRA, miscellaneous clothing and furniture and a 1995 Honda automobile in CT Page 6579 which the market value and the loan value were the same.
According to the decree and the separation agreement all the right, title and interest in and to the family house at 5 Goodhill Road, Weston, Connecticut was transferred by the defendant to the plaintiff. The plaintiff was obligated to pay the defendant $75,000 in cash, three months after the decree.
The last financial affidavit filed by the defendant is November, 1996. He has net assets of $2,000 consisting of furniture. He has liabilities of $30,000.
The last financial affidavit filed by the plaintiff is August, 1996. She has two automobiles, a small amount of cash and the sole ownership in the property at 5 Goodhill Road, Weston. The house has increased in value to $425,000. The two mortgages have increased to $285,000, leaving a net equity in the range of $140,000. The court finds that the financial circumstances of both parties have deteriorated since the 1986 decree.
The plaintiff filed five financial affidavits since the motion for modification. Three of them, February 21, 1995, May 21, 1995 and August 23, 1986, indicate that her sole source of income is $300 per week unemployment compensation. Two other affidavits dated July 31, 1995 and December 2, 1995 indicate $52,000 a year earnings from her self employed business of fashion design/sales.
The defendant's financial affidavit of May 22, 1995 shows $64,000 annually from Scitor International Communication as a salesman. His July 31, 1995 affidavit indicates the same $64,000 per year. His October 21, 1996 affidavit indicates he is now a salesman in the telecommunications industry for Cable and Wireless, Inc. earning $49,000 per year. The evidence at trial indicates that the defendant's 1993 income tax return showed $105,902 gross income from his position as a telecommunication salesman for Infonet, the same employer that he had at the time of the decree. His tax return for 1994 shows $110,100 from the same source.
The defendant argues that the cost of college actually incurred for the oldest daughter, Crista, was much higher than costs at the University of Connecticut. She attended the University of Richmond in Richmond, Virginia. Her tuition was $13,000 to $16,000 a year in addition to room, board, and travel. The defendant also argues that the additional costs for Carel at Arizona State University are also greater than costs at the CT Page 6580 University of Connecticut. Her 1996-1997 tuition is $8,000 plus $7,000 a year expenses for room, board and one airline round trip.
The defendant argues that his inability to pay the girls' college education was discussed with both the plaintiff and the two daughters. Despite that discussion, his lower earnings in 1991 and 1992 and his vowed financial inability to make a contribution, the plaintiff and his two daughters decided on their own to opt for the more expensive schools. The defendant claims that he was not financially able, based upon his assets and his earning capacity, to make such payments, and, therefore, he should not be obligated to pay the higher expenses.
The plaintiff argues that the choice of schooling was discussed thoroughly by both parents. She claims he was and is capable of contributing. He didn't file an application with the court objecting to the cost of schooling. He made little voluntary payment, even at the University of Connecticut's rate. Furthermore, the agreement does not require prior court approval of a particular school nor the obtaining of the other parent's consent. The agreement and decree did not prevent the defendant from applying to the court to seek relief from Paragraph 2.4.
The plaintiff's argument is well taken. The defendant is obligated to pay for the schooling expenses, no matter how expensive, to the extent that he is financially able. It may be that his financial ability is the same whether the child attended the University of Connecticut or the University of Richmond. The focus in the agreement and the court's authority, is the extent of the defendant's financial capabilities, not the total overall cost.
The testimony indicates that the defendant made periodic payments of $50 on a sporadic basis directly to the children for a total of $800. The evidence further discloses that the defendant paid $800 monthly from January, 1996 to June, 1996; a sum of $4,800. The defendant's payments toward his two daughters' education is found to be $5,600. The defendant should be so credited.
The evidence also discloses that the parties had set up a fund for the three children from family gifts, birthday gifts and other donations. The funds increased in value. None of the two daughters' funds nor the son's fund were disclosed on any financial affidavit. They were not disclosed to the court. The parties now differ as to the purpose of the funds: the defendant claiming that CT Page 6581 it is for education; the plaintiff claiming that it was for any purpose that she felt, as the sole custodian, should be appropriate for the child such as medical costs, purchase of a cello or education.
Whatever the parties' side agreement concerning these funds, the funds themselves were was not disclosed to the 1986 court. The court was thus prevented from entering any orders or findings concerning the three funds. This lack of financial disclosure is not to be countenanced by a superior court. Failure to disclose assets of the parties whether held individually, in trust for or in the name of a minor child is "contrary to public policy." Side agreements based on undisclosed assets are "void and unenforceable". Baker v. Baker, 187 Conn. 315, 322 (1982). Full and complete disclosure by all parties, to each other and to the court, is mandatory in all dissolution cases. Monroe v. Monroe,177 Conn. 173, 183 (1979). "The problems in this case, however, go deeper than just the improper concealment from the trial court. As a consequence of the agreement, both parties filed inaccurate and misleading financial affidavits with the trial court. The effect of these affidavits was to misinform the court as to the actual value of the assets held by each party. The significance of such misinformation cannot be ignored where, inter alia, the amount involves such a large percentage of the final property disposition. Thus, the effects of the parties' concealment from the court cannot be remedied fully by the mere voiding of their agreement." Bakerv. Baker, supra 322-23.
The Baker court, incensed by the concealment from the trial court of a private agreement, remanded the case to the trial court with the direction that the dissolution of marriage judgment be set aside as to the financial and property dispositions and that a new trial be ordered on these issues.
According to the evidence in this case each of the three funds contained $45,000. Based on the current assets of the parties, the children's three funds are arguably the largest family asset.
CONCLUSION
The court will not set aside the dissolution judgment as penalty for the failure to disclose. The defendant's testimony, that these funds would be used for college education, is credible. His opinion is buttressed by the actual expenditure of the majority of the funds by the plaintiff from the two daughters' funds for CT Page 6582 college expenses.
Therefore, the court feels the proper disposition of these contempt motions is to reconstruct the actual expenditures of four years of college for Crista and Carel. Each $45,000 fund will be applied as credit for the college expenses. Thereafter, the responsibility for any remaining expenses will be determined based upon the parties' earnings, earning capacity and assets. The court will then allocate these expenses between the parties.
Exhibit 1 shows that the January, 1995 junior spring semester abroad tuition for Crista was $9,010. The prior fall semester tuition was $7,000. Therefore, it is assumed that the four year tuition at the University of Richmond is as follows.
Freshman Year $12,500
Sophomore Year $13,500
Junior Year $16,010
 Senior Year $15,500 ------- $57,510
In addition Exhibit 1 shows $525 a month for rent, food, utilities and other expenses for ten months in each school year. The court finds these expenses reasonable. The costs for four years at that ten month rate would be $21,000. The European summer air travel abroad plus four round trip airplane trips to and from Virginia would amount to an additional $2,000. Thus the total college cost for Crista is $80,510. Subtracting the $45,000 leaves a shortfall of $35,510.
For Carel Exhibit 1 shows that her tuition for the junior spring semester is $3,840 and fall tuition for senior year is $3,950, both at Arizona State University. The court therefore determines the actual four year tuition is to be as follows.
Freshman $7,320
Sophomore $7,500
Summer School $ 500 CT Page 6583
Junior $7,680
 Senior $7,900 ------- $30,900
The court finds as reasonable the Exhibit 1 expenses of $650 a month for rent, food, utilities and other expenses. Times ten months per school year for four years. The total is $26,000. Four airfares at $450 each amount to $1,800. Thus the total for Carel's tuition, room, board and airfare costs is $58,700. Subtracting the $45,000 leaves a shortfall of $13,700.
The evidence does not demonstrate the actual college expenses incurred for all four years. There is sufficient evidence and testimony for the court to reasonably infer the costs for the years not testified to nor shown in Exhibit 1.
Both the plaintiff and defendant were earning approximately the same amount of money in 1986. At the time they signed the agreement they agreed that they were obligated to pay for the college expenses of their children "to the extent they would be financially able". The defendant's earnings increased in 1993 and 1994, the first two years of Carel's college and the middle two years of Crista's college. The defendant's financial situation substantially improved during those two years.
The plaintiff claims that the college expenses should be split on a 50-50 basis. Based upon all the circumstances the court determines that division to be fair. The total shortfall for Crista's is $35,510, and the total shortfall for Carel is $13,700, a total of $49,210. Each parent is responsible for $24,605. The defendant is credited with $5,600 paid as stated and therefore is obligated to reimburse the plaintiff $19,005. The plaintiff has paid the total college expenses either directly or by cosigning student loans. The daughters' two funds have been depleted.
The defendant does not appear to have the present ability to pay $19,005 lump sum. He has no assets. His current financial affidavit indicates that he does not have the earning capacity. Therefore, the court cannot find the defendant in contempt of court.
The court does find that the defendant did have the financial ability in 1993 and 1994 to make those payments. The plaintiff had CT Page 6584 to incur substantial attorney's fees to collect this amount of money. The court has on file an affidavit by Attorney David Feliu seeking attorney's fees and sheriff's costs in the amount of approximately $6,000. The court will award $3,000 attorney's fees.
Therefore, the defendant is obligated to pay to the plaintiff the sum of $22,005.00. This sum is determined to be in the nature of support and will not be dischargeable in bankruptcy.
The defendant argues that he does not have sufficient money to pay his current expenses. The court notes that the defendant has remarried, and his new wife has three children. He is not legally responsible for the support of his stepchildren. The defendant's November 1996 financial affidavit shows housing costs for his current wife's Pelham Manor house of $2,891 monthly. The court finds that the defendant remarried knowing that he had a financial obligation to his three minor children including college expenses. That obligation is primary. The defendant's September 15, 1986 financial affidavit showed housing costs of $192.50 weekly. He has increased those housing costs by over $2,000 a month in order to provide for children for whom he has no legal obligation to support. Moreover, his November, 1996 financial affidavit demonstrates a lifestyle that is lavish considering his earnings of $49,000 per year; to wit, a $590 monthly auto lease. The court is of the opinion that the defendant has the ability to alter his lifestyle in order to repay the plaintiff the $22,005.00 on a periodic basis.
The court continues this matter. A hearing will be held to determine the amount of periodic payments on the $22,005.00 arrears. The defendant is to file a new financial affidavit along with verification of his earnings, his current wife's earnings and expenses to the court at the time of that new hearing. McGuinnessv. McGuinness, 185 Conn. 7, 12 (1981).
The court denies the June 7, 1994 Motion for Modification of child support for Crista and Carel. At the time of the filing of the motion they were both over eighteen. The agreement did not provide for modification of child support beyond eighteen. The court has no subject matter jurisdiction since the modification of child support is not based upon a written agreement. Hirtle v.Hirtle, supra 400.
The court must now reslove the motion for modification of child support for Justin. The court has before it conflicting CT Page 6585 financial affidavits filed by the plaintiff. She was receiving $300 unemployment on three financial affidavits and $52,000 earnings on two others. The defendant's income also varies: $49,000 a year in November, 1996, $64,000 a year on his 1995 affidavits and tax returns showing over $100,000 in 1993 and 1994. The court does have before it a child support guidelines worksheet dated July 31, 1995 prepared with the assistance of the parties. On the worksheet the plaintiff's earnings are $52,000 and the defendant's earnings are $56,000. This worksheet shows that the defendant's obligation for child support for one child is $171 per week; $735 per month.
In accordance with C.G.S. Section 46b-84 the child support guidelines require a modification of the child support to $735 per week. The child support in accordance with C.G.S. Section 46b-66
cannot extend beyond the eighteenth birthday of Justin. He became eighteen on May 9, 1995. Service of the modification motion was August 11, 1994. C.G.S. Section 46b-86(a), C.G.S. Section 52-50.
The current child support order is $450 per month. The evidence indicates the the defendant paid each $450 monthly payment through Justin's eighteenth birthday. The child support is modified to $735 monthly retroactive to August 11, 1994. The additional child support is $285 a month. Child support of $285 monthly from August 11, 1994 through May 8, 1995 is $2,536.00. The arrears are found to be $2,536.00. The defendant is ordered to pay to the plaintiff the sum of $450 on the first day of each calendar month commencing August 1, 1997 with the final payment of $286 on January 1, 1998 until the total sum of $2,536.00 is paid as arrears for the child support.
The plaintiff is to reclaim the Motion for Contempt for a hearing to determine periodic payments, if any, on the $22,005.00 college education arrears.
TIERNEY, J.